UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1759
(1:10-cv-03472-RDB)

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Petitioner - Appellant,

v.

RANDSTAD; RANDSTAD NORTH AMERICAN LP; RANDSTAD GENERAL PARTNERS (US); RANDSTAD US LP; RANDSTAD INHOUSE SERVICES LP,

Respondents - Appellees.

O R D E R

The Court amends its opinion filed July 18, 2012, as follows:

On page 7, item (1) of the numbered list -- the word "DOCUMENTS" in upper case is corrected to read "Documents."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Petitioner-Appellant,*

v.

RANDSTAD; RANDSTAD NORTH
AMERICAN LP; RANDSTAD GENERAL
PARTNERS (US); RANDSTAD US LP;
RANDSTAD INHOUSE SERVICES LP,

*Respondents-Appellees.*

No. 11-1759

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:10-cv-03472-RDB)

Argued: May 15, 2012

Decided: July 18, 2012

Before DAVIS and KEENAN, Circuit Judges, and
James R. SPENCER, United States District Judge for the
Eastern District of Virginia,
sitting by designation.

Reversed and remanded by published opinion. Judge Davis
wrote the opinion, in which Judge Keenan and Judge Spencer
joined.

**COUNSEL**

**ARGUED:** Susan Ruth Oxford, U.S. EQUAL EMPLOY-
MENT OPPORTUNITY COMMISSION, Washington, D.C.,
for Appellant. John S. Snelling, LEWIS BRISBOIS BIS-
GAARD & SMITH, Atlanta, Georgia, for Appellees. **ON
BRIEF:** P. David Lopez, General Counsel, Lorraine C.
Davis, Acting Associate General Counsel, U.S. EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION, Wash-
ington, D.C., for Appellant. Christopher W. Mahoney,
DUANE MORRIS, LLP, Washington, D.C., for Appellees.

**OPINION**

DAVIS, Circuit Judge:

Kevin Morrison, a resident of Maryland, was born in
Jamaica and cannot read or write English. He filed a charge
of discrimination with the Equal Employment Opportunity
Commission ("EEOC" or Commission) asserting that Appel-
lee Randstad, which provides temporary staffing services to
client companies, terminated his employment pursuant to a
requirement that its employees read and write English. Morri-
son alleged that Randstad's literacy policy violated Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§ 2000e, et seq. Two years later, in an amended charge, Mor-
rison asserted that the literacy policy violated the Americans
with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.,
because he has a learning disability. In investigating Morri-
son's charges, the EEOC served an administrative subpoena
on Randstad, which Randstad resisted, in part. When the
EEOC sought judicial enforcement of its subpoena, the dis-
trict court denied relief. For the following reasons, we reverse
the order of the district court denying enforcement.

# I.

## A.

Randstad has 600 branch offices in thirty-seven states, including thirteen offices in Maryland. In any given week the company employs a total of approximately 45,000 individuals: 1,800 (Randstad's "internal talent") who recruit, screen, and hire temporary and permanent employees for client companies, and 43,200 (Randstad's "external talent") who are on assignment to Randstad's customers. Randstad focuses its staffing services on two main types of clients: "light industrial" clients that use laborers in manufacturing or warehouse settings, and "administrative" clients that use clerical and administrative employees in office settings.

In August 2005, Morrison approached Randstad's Hagerstown, Maryland office, seeking temporary employment. He was ineligible for assignment with Randstad's administrative clients because he does not have a high school diploma or its equivalent, and so Randstad placed him in industrial positions. He first successfully completed a month-long assignment as a mail clerk for Randstad client Good Humor. In September 2005, Randstad referred Morrison to two temporary warehouse positions, one at Ashley Home Store, Inc., and the other at Cosmic Pet Products, Inc. According to Randstad, both clients terminated Morrison within days because of poor performance. During that time Randstad was not aware that Morrison could not read or write.

Morrison did not seek any additional assignments for more than a year. In September 2006, however, he returned to Randstad's Hagerstown office in search of another temporary work assignment. As before, Randstad sent him to fill a warehouse job, this time with Lenox, Inc. Upon arriving at Lenox's facilities, he was asked to fill out some forms. Unable to read or write, Morrison called his placement manager at Randstad to ask if she would help him complete the

forms. According to Morrison, the manager told him, "We don't hire people who cannot read. Come back when you learn to read." J.A. 30. On September 28, 2006, Randstad ended Morrison's assignment and informed him that, although it remained willing to place him in the future, it would do so only if he were to develop remedial reading and writing skills.

On January 5, 2007, Morrison filed a charge of discrimination with the EEOC. A checkbox on the form identified the type of discrimination as national origin discrimination and the following allegations stated:

> I. On September 29, 2006, Randstad denied me placement in a position with its customer Lenox. Randstad had previously placed me in jobs in 2005 and 2006. Randstad sent me to Lenox where I was given forms to complete and return. I called Randstad and spoke with Renee. I asked Renee if Randstad could assistance [sic] me in completing the forms I received from Lenox. I was told "We don't hire people who can not read. Come back when you learn to read."

> II. I was given no explanation for Randstad's discriminatory action.

> III. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, regarding failure to hire because of my national origin, Jamaican.

J.A. 30. The EEOC served a copy of the charge on Randstad on February 1, 2007, and began to investigate.

Randstad timely responded to the charge. It admitted that Morrison was terminated because he could not read, but denied that the termination was the result of national origin discrimination. Rather, Randstad explained, the company

maintained an unwritten policy against hiring people who cannot read because "virtually all of the assignments that Randstad is called upon to fill require reading and/or writing skills." J.A. 36. As for the administrative positions, most of Randstad's clients have minimum education requirements; indeed, the EEOC has since conceded that Morrison was not eligible for an administrative position. As for Randstad's industrial clients, the company explained that although there is no written policy requiring that employees be literate, "the inability to read and comprehend safety notices, warnings, or machinery operating instructions potentially [would] place[ ] Mr. Morrison and his co-workers at risk of serious injury." J.A. 36. Because the company's unwritten literacy policy was justified, Randstad argued, and because there was "no evidence of discriminatory animus on Randstad's behalf toward Mr. Morrison," the EEOC should enter a "no cause" finding in Morrison's case. *Id.*

The EEOC investigation remained open for approximately two years without the Commission issuing a Request for Information or seeking any other information concerning Morrison's allegations. During that time Morrison underwent a psychological evaluation that revealed "an intellectual disability (mild retardation) that prevents him from reading and writing." J.A. 11. On January 30, 2009, over two years after filing the original charge, Morrison filed an amended charge of discrimination. The amended charge contained two changes. First, instead of the checkbox for national origin discrimination, the checkbox for disability discrimination was marked. Second, in the last sentence of the factual allegation section, the allegation that Randstad's actions violated Title VII was replaced with the following: "I believe I have been discriminated against in violation of the [ADA] regarding failure to accommodate because of my disability." J.A. 39. As the EEOC explained, Morrison allegedly has a learning disability that prevents him from learning to read and write English.[1]

---

[1] The record before us does not disclose the identity of the person who physically completed the charging documents Morrison filed with the

Randstad was given notice of the amended charge on February 3, 2009. In response, Randstad stated that its original position statement was "largely unaffected" by the amendment, but it "supplement[ed]" its prior letter by arguing that Morrison's charge of disability discrimination lacked merit because illiteracy is only a protected disability under the ADA if it "stems from 'an organic dysfunction rather than a lack of education,'" J.A. 44 (quoting *Morisky v. Broward County*, 80 F.3d 445 (11th Cir. 1996)), and there was "no evidence that Mr. Morrison's illiteracy follows from a physical or mental impairment." *Id.* Randstad also argued that, even if Morrison's illiteracy was a protected disability, he had an obligation to inform Randstad of the impairment but failed to do so.

The EEOC issued a Request for Information ("RFI") seeking, among other things, information about any literacy requirements Randstad imposes, and a list of all position assignments made by Randstad's Hagerstown office from 2006 through 2009.[2] In response, Randstad explained that although the company did not have a "formal" literacy policy, "a significant number of assignments . . . require reading and writing skills," and so Randstad "requires talent to be at least literate at a remedial level." J.A. 53. As for information on other position assignments, Randstad objected, arguing the request was "unduly burdensome" and that the information requested was "irrelevant to the resolution of [Morrison's] charge." J.A. 54.

The EEOC maintained that Morrison's charge authorized it to obtain the requested information, and not just for Rand-

---

EEOC. We think it is reasonably inferable (as our colloquy with counsel at oral argument indicated) that an EEOC staffer completed the typed forms.

[2]In September 2009 the EEOC had issued a letter finding Randstad in violation of the ADA, but revoked that determination and reopened the investigation the next month.

stad's Hagerstown office. Thus, on January 15, 2010, it issued an administrative subpoena that requested, among other things, "documents or a data compilation setting forth all position assignments made by [Randstad] during the period January 1, 2005 through the present." J.A. 59. After Randstad objected to the time period and nationwide scope of the subpoena, the Commission narrowed the geographic scope to Randstad's thirteen Maryland offices but otherwise insisted on receiving information on all position assignments made by those offices for the years 2005 through 2009. Randstad provided information about the positions to which Morrison himself was assigned, at Good Humor, Lenox, and the two other temporary warehouse positions in September 2005, but otherwise refused to comply.

Thus, the EEOC filed the instant petition for enforcement of the disputed portion of the subpoena ("the requested information") namely:

(1) Documents or a data compilation setting forth all non-administrative position assignments made by Randstad's thirteen Maryland offices from 2005 through 2009, including position title, client name, and the date the assignment was filled;[3]

(2) Copies of job orders and job descriptions for each position;

(3) Copies of all applications for each position; and

(4) A statement for each position as to whether

---

[3]In fact the subpoena also requested information on administrative positions, for which Morrison was concededly unqualified even absent a literacy requirement. On appeal the EEOC has abandoned that request. Accordingly, for our purposes we consider the EEOC's request as limited to non-administrative positions.

reading and writing was required for the position.

The EEOC's petition for enforcement asserted that both Title VII and the ADA, combined with Morrison's original and amended charges of discrimination, authorized it to obtain the information and documents sought under the subpoena. Title VII authorized the investigation, the Commission asserted, because Randstad's literacy requirement "may have a disparate impact on Jamaicans and others who are not fluent in English due to their national origin." J.A. 15. In addition, the Commission asserted, because Morrison's illiteracy resulted in part from a learning disability, and because "[d]iscrimination based on ability to read may constitute a violation of the ADA," J.A. 16, the subpoena was also authorized by the ADA. The Commission argued that information about all of Randstad's positions in Maryland was relevant because if (contrary to Randstad's representation) some Randstad positions do not actually require reading skills, the fact that Randstad nevertheless hires only people who can read could be evidence of discrimination. Such evidence could also "uncover the existence of other individuals who have been harmed by Randstad's literacy policy." J.A. 19.

The district court ordered Randstad to show cause why the subpoena should not be enforced pursuant to Title VII and/or the ADA. In its answer, Randstad first argued that Morrison's charges of discrimination did not authorize the investigation because although Randstad generally does not give assignments to people who cannot read, that is not because the company discriminates against foreign-born or learning-disabled individuals, but rather because reading "is an implicit requirement for virtually every light industrial client assignment." J.A. 66-67. While Randstad "has never maintained a policy against hiring individuals who cannot read and write," it argued, it "typically has no work for talent who lack remedial reading skills." J.A. 67. Randstad's human resources manager asserted that it sometimes fills positions that "involve purely

manual labor where reading may not be required," but such positions are "rare," "are not a focus of Randstad's business," and "would ordinarily not be in a factory or warehouse setting." J.A. 89.

Second, Randstad argued that, to the extent the EEOC relies on the ADA, Morrison's amended charge was "untimely on its face" because it alleged a "new theory of recovery" and therefore did not relate back to the date of his original charge. J.A. 78. Third, Randstad argued that, even if one or both of Morrison's charges were timely, information on positions other than the ones to which Morrison was assigned was not "relevant" because Morrison did not allege "systemic discrimination or that Randstad's policies have a disparate impact" on a "protected class." J.A. 79. Fourth, Randstad argued, even if some of the requested information was relevant, the subpoena should not be enforced because complying with the subpoena would be unduly burdensome. Its Maryland branches made over 100,000 temporary assignments during the time period of the subpoena. Due to the structure of Randstad's databases, compiling the requested information would require a database administrator, IT developer, and business analyst each to spend 40 hours reviewing 100,000 job orders, at a labor cost of $14,000 to $19,000.

The EEOC argued it had jurisdiction to investigate under both Title VII and the ADA because Morrison's original charge remained in effect and the amended charge's allegation of disability discrimination "flow[s] from the national origin discrimination because they are both the result of the same literacy requirement." J.A. 115. It argued the full scope of the materials sought were relevant because "Respondent's refusal to assign Morrison based on his inability to read and write may not be an isolated incident, but rather may be an instance of a larger discriminatory practice of turning away illiterate individuals when there is available work within their skill sets." J.A. 111. Moreover, the EEOC argued, Randstad's position that it "typically has no work for talent who lack

remedial reading skills," J.A. 67, was belied by the fact that Morrison himself was placed in several positions. Finally, it argued, there was no undue burden because Randstad's cost estimate could not have been correct (if it were, it would mean the three employees preparing the materials would receive annual salaries of nearly $330,000), and in any event a showing that "production will tie-up three employees for a week . . . do[es] not rise to the level of establishing undue burden." J.A. 117.

B.

At a hearing on the Commission's petition, the EEOC reiterated its position that there were two independent bases for the Commission's authority to issue the subpoena: Title VII and the ADA. With respect to Title VII, Morrison's original charge alleged that Randstad's literacy requirement discriminated on the basis of national origin. The Commission explained that the information requested was relevant to alleged national origin discrimination because "a reading requirement is going to have a disparate impact on people of varying national origin." J.A. 131. Citing a Department of Education study, the Commission explained, "[O]f the people who read at the lowest levels, twenty-six percent of them are people who are learning English currently, so there is a broad overlap between people who are unable to read and people who have a unique national origin." J.A. 133.

The second basis of authority for the subpoena, the Commission argued, was the ADA, arising out of Morrison's amended charge, which alleged that the literacy requirement discriminated on the basis of disability. The Commission recognized that if the amended charge had been filed as a stand-alone charge, it would have been untimely. The Commission argued that the amended charge related back to the original charge, however, because the disability discrimination claim arises out of the same factual allegations raised in the original charge, and the amended charge merely altered the statute

under which "the alleged discrimination constitutes an unlawful employment practice." J.A. 122.

The district court denied the EEOC's petition to enforce the subpoena. *See EEOC v. Randstad*, 765 F. Supp. 2d 734, 742 (D. Md. 2011). As for Title VII, the district court rejected on relevance grounds Morrison's national origin discrimination claim as a basis for enforcing the subpoena.[4] That is, assuming Morrison's original charge triggered Title VII as a basis for the EEOC's authority to investigate, the court disagreed with the Commission's alleged factual nexus between national origin discrimination and literacy requirements. Information related to reading and writing requirements for particular positions "relates to the matter of reading and writing ability, not national origin," the court stated. J.A. 132. In particular, the court expressed skepticism about the causal link between Morrison's Jamaican origin and his illiteracy:

> Jamaica is an English speaking island. It's not Haiti . . . . I'm not really sure where you make the jump from a national origin claim of discrimination to the matter of literacy in English, particularly from a country that, in fact, does have English as its basic native language. Clearly there is what is known as Patois spoken by other members of the community there, sometimes those with lesser education. But English is clearly spoken in Kingston and in Montego Bay. English is the spoken language in Jamaica.

J.A. 134. Thus, the court apparently concluded, none of the information requested in the subpoena would be relevant to Morrison's charge of national origin discrimination.

As for the ADA, the district court rejected the Commission's relation-back argument, reasoning that when the

---

[4]The district court's analysis under Title VII is revealed only in the transcript of the hearing. The written opinion addresses only the ADA.

amended charge added the ADA claim, "a new theory of recovery" was put forward and "an amendment to an EEOC charge alleging a new theory of recovery does not relate back to the original charge." *Randstad*, 765 F. Supp. 2d at 740 (citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)). Thus, the court concluded it did not have jurisdiction to enforce the subpoena under the ADA.

The court also offered two alternative grounds for declining to enforce the subpoena under the ADA. First, the court found that even if it had jurisdiction under the ADA, any information beyond that which Randstad had already produced was irrelevant to Morrison's charge of disability discrimination by Randstad's Hagerstown office. The court ruled that because the subpoena requested information about all Randstad positions (including administrative positions, for which Morrison was concededly unqualified), for all Maryland offices (even though Morrison solely sought employment by Randstad in its Hagerstown office), and for a five-year period after Morrison's termination (even though Morrison was employed by Randstad only from August 2005 until September 2006), the information requested was beyond the scope permitted by the amended charge. *Id.* at 741-42. Second, the court ruled that, even if it had jurisdiction under the ADA or Title VII, and even if the requested materials were relevant, the cost of compliance with the subpoena—$14,000 to $19,000 according to Randstad—rendered the requests unduly burdensome. *Id.* at 742.

The EEOC sought reconsideration, which the district court denied, and then timely appealed.

II.

Title VII proscribes discriminatory employment practices on the basis of, among other things, national origin. 42 U.S.C. § 2000e-2. The ADA proscribes discriminatory employment practices based on disability, including an employer's failure

to provide a reasonable accommodation. 42 U.S.C. § 12112(a), (b)(5)(A). Each statute authorizes the EEOC to investigate instances of discrimination, but only if a charge of discrimination has been made with respect to a particular person or entity. 42 U.S.C. § 2000e-5(b); 42 U.S.C. § 12117(a).

If a charge of discrimination triggers the EEOC's authority to investigate under Title VII or the ADA, the EEOC may access "any evidence . . . that relates to unlawful employment practices covered by [the statute] and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a); *see also* 29 U.S.C. § 161 (describing the investigatory powers of the National Labor Relations Board, which the EEOC also may exercise pursuant to Title VII, *see* 42 U.S.C. § 2000e-9, and the ADA, *see* 42 U.S.C. § 12117(a)). If a respondent does not comply voluntarily with requests for such evidence, the EEOC may issue an administrative subpoena, 29 U.S.C. § 161(a), and may petition for enforcement in federal district court. *Id.* § 161(2); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 65 (1984) (explaining that the existence of a charge of discrimination relevant to material being sought through an administrative subpoena is a jurisdictional prerequisite to the enforcement of the subpoena).

A district court's role in enforcing administrative subpoenas is "sharply limited." *EEOC v. City of Norfolk Police Dep't*, 45 F.3d 80, 82 (4th Cir. 1995). To obtain judicial enforcement of a subpoena, the EEOC need demonstrate only that "(1) it is authorized to make such investigation; (2) it has complied with statutory requirements of due process; and (3) the materials requested are relevant." *Id.* The process of reviewing an administrative subpoena for judicial enforcement "is not one for a determination of the underlying claim on its merits; Congress has delegated that function to the discretion of the administrative agency." *EEOC v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 303 (4th Cir. 1992). To establish its authority to investigate, the EEOC need only present an "arguable" basis for jurisdiction. *Norfolk Police Dep't*, 45 F.3d

at 85. As long as jurisdiction is "plausible" and not "plainly lacking," *EEOC v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009), the subpoena should be enforced, unless the party being investigated demonstrates that the subpoena is unduly burdensome. *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 476 (4th Cir. 1986).

We review the factual findings underlying a district court's enforcement determination of an administrative subpoena for clear error and its legal conclusions de novo. *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011). The district court's ultimate decision whether and to what extent to enforce a subpoena is reviewed for abuse of discretion. *NLRB v. Carolina Food Processors, Inc.*, 81 F.3d 507, 510 (4th Cir. 1996).

We first explain why, contrary to the district court's conclusion, the EEOC had authority to investigate Morrison's charges under both the ADA and Title VII. We then explain why the requested materials were within the scope of the Commission's investigatory authority. The applicable legal standards thus clarified, we conclude that the Commission is entitled to an order enforcing its subpoena.

A.

We first address whether the EEOC had authority to seek enforcement of the subpoena under the ADA and/or under Title VII. This requires that we decide (1) whether the amended charge alleging an ADA violation relates back to the date the original charge was filed, and (2) whether the original charge alleging a Title VII violation continued to trigger the EEOC's investigatory authority even after the amended charge was filed.

1.

As explained above, Morrison's amended charge, filed on January 30, 2009, alleged that Randstad discriminated against

him by refusing to accommodate his alleged learning disability, and thereby violated the ADA. As an original charge, the ADA charge clearly would have been untimely. The question on appeal is whether the amended charge, which alleged the same facts as the original charge (refusal to give him temporary employment because he could not read) but asserted that those facts violated a different statute (the ADA instead of Title VII) relates back to January 5, 2007, the filing date of the original charge.

EEOC regulations provide that an amended charge will relate back to "the date the charge was first received" if the amendment (1) "cure[s] technical defects or omissions, including failure to verify the charge," (2) "clarif[ies] and amplif[ies] allegations made therein," or (3) "alleg[es] additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b).[5] As noted, the factual allegations in Morrison's two charges were identical: that Randstad denied him placement because it maintains a policy of not hiring people who cannot read. Morrison originally alleged that the literacy requirement was discriminatory because it imposed unwarranted disadvantages on people who, like him, were from another country. In his amended charge, he alleged that the same literacy requirement, which led to the same adverse employment decision, was discriminatory for a different reason: it disadvantaged people who, like him (he had later learned), have a learning disability.

---

[5]In full the regulation reads:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b).

The Commission argues Morrison's amended charge "merely clarifie[d] that there is another possible explanation for the employment action referenced in the original charge: disability discrimination." Appellant's Br. at 26. The Commission argues that Morrison's amended charge relates back under the "clarify and amplify" prong of § 1601.12(b) because (1) § 1601.12(b) is a reasonable exercise of the EEOC's authority under the ADA and entitled to deference, and (2) its interpretation of § 1601.12(b) as applying to Morrison's amendment is also reasonable and entitled to deference. We agree.

Congress has expressly delegated to the EEOC the authority to promulgate "suitable procedural regulations to carry out the provisions of" Title VII and the ADA. 42 U.S.C. § 2000e-12(a). Section 1601.12(b) is a reasonable exercise of that authority. Indeed, Randstad does not argue § 1601.12(b) exceeded the EEOC's authority, and for good reason. We have recognized the "wide discretion" Congress granted the EEOC to promulgate procedural regulations governing discrimination charges. *EEOC v. Bethlehem Steel Corp.*, 765 F.2d 427, 429 (4th Cir. 1985). In *Edelman v. Lynchburg College*, 535 U.S. 106 (2002), the Court unanimously upheld a different aspect of 29 C.F.R. § 1601.12(b) as a reasonable exercise of the EEOC's authority under 42 U.S.C. § 2000e-12(a).[6] As Justice O'Connor observed in addressing yet another aspect of the EEOC's administrative processes, defer-

---

[6]In *Edelman* the Court considered § 1601.12(b)'s pronouncement that although a charge of discrimination must be "under oath or affirmation," 42 U.S.C. § 2000e-5(b), such verification constitutes an "amend[ment] to cure technical defects or omissions" and therefore relates back to the date an original, unverified charge was filed. 29 C.F.R. § 1601.12(b). The majority upheld that interpretation, and indeed considered it "not only a reasonable one, but the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch." 535 U.S. at 114. The other justices also agreed the EEOC's interpretation was a reasonable exercise of the EEOC's authority. *See id.* at 119 (Thomas, J., concurring); *id.* at 121 (O'Connor, J., concurring in the judgment).

ence to the EEOC is "particularly appropriate" when it comes to EEOC regulations involving a "technical issue of agency procedure." *EEOC v. Commercial Office Prods.*, 486 U.S. 107, 125 (1988) (O'Connor, J., concurring). Just as the *Edelman* Court upheld the EEOC's interpretation of Title VII as permitting relation back of a verified charge to the filing date of a prior unverified charge, we hold that the EEOC acted reasonably in interpreting the ADA as permitting relation back of a charge that "clarif[ies] and amplif[ies] allegations" made in a prior charge.

We also find reasonable the EEOC's interpretation of § 1601.12(b) as permitting relation back of the amended charge here. As noted, § 1601.12(b) permits an amended charge to relate back if it "clarif[ies] and amplif[ies] allegations made" in a prior timely charge. In arguing that Morrison's amended charge relates back, the EEOC interprets the phrase "clarif[ies] and amplif[ies] allegations" as encompassing amended charges in which, as here, the charging party makes no new factual allegations but rather solely revises his or her charge to allege that the same facts constitute a violation of a different statute. An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *cf. Bethlehem Steel*, 765 F.2d at 429 (upholding EEOC's interpretation of charge-filing regulation because the interpretation was "reasonable").

The EEOC's interpretation is not inconsistent with § 1601.12(b), and we see no reason to find it "plainly erroneous." Charge-filing time limits serve "to encourage a potential charging party to raise a discrimination claim before it gets stale, for the sake of a reliable result and a speedy end to any illegal practice that proves out," *Edelman*, 535 U.S. at 112-13, and to "protect employers from the burden of defending claims arising from employment decisions that are long past," *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256-57 (1980).

Interpreting § 1601.12(b) as applying to amended charges that alter solely the statutory basis or legal theory of recovery is entirely consistent with these purposes. Morrison's amendment did not assert a "stale" claim because it did not allege any discriminatory incidents other than those already included in the original charge. Rather, it asserted that the same adverse employment action was at least in part the product of a different type of discrimination: disability discrimination. Relating back the ADA charge to the date of the original charge does not require Randstad to defend against a "stale" claim arising from an employment decision that is "long past." Moreover, there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter," and the Commission's position is not a "post hoc rationalization" advanced simply to "defend past agency action against attack." *Auer*, 519 U.S. at 462. This is also not a situation where "the underlying regulation does little more than restate the terms of the statute itself," in which case *Auer* deference would be unwarranted. *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

For these reasons, we defer to the EEOC's promulgation of § 1601.12(b) and its interpretation thereof. *Accord Washington v. Kroger*, 671 F.2d 1072, 1075-76 (8th Cir. 1982) (holding that, based on an earlier version of § 1601.12(b), an amended charge relates back where it alleges the same facts as the original charge even though the "nature of discrimination alleged" is different) (citing 29 C.F.R. § 1601.11(b) (1973)); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 464 (5th Cir. 1970) (also citing the precursor to § 1601.12(b), and allowing a national origin discrimination charge to relate back to the date of a prior sex discrimination charge because "a charging party's failure to attach the correct legal conclusion to the factual allegations contained in a charge of discrimination is a mere technical defect"); *see also id.* at 462 ("The selection of the type of discrimination alleged, i.e., the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged. In the

context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations.").[7]

As noted above, the district court relied on *Evans*, 80 F.3d at 963, for the proposition that "an amendment to an EEOC charge alleging a new theory of recovery does not relate back to the original charge." *Randstad*, 765 F. Supp. 2d at 740. That reliance was misplaced. First, *Evans* was a case deciding the merits of a discrimination claim at the summary judgment stage, whereas this case presents a proceeding to enforce an administrative subpoena. Because the strength of the nexus between factual allegations in an original charge and a theory of recovery requires some degree of inquiry into the merits, and because the EEOC has presented a plausible nexus here, *Evans* is of limited authority for refusing to enforce the EEOC's subpoena. Second, in *Evans*, the plaintiff filed her private lawsuit very shortly after amending her charge, which prevented the local agency from investigating her allegation of age discrimination. A crucial reason we rejected the plaintiff's relation-back argument in *Evans* was because permitting relation back in those circumstances "depriv[ed] the employer of adequate notice and result[ed] in a failure to investigate by the responsible agency." *Evans*, 80 F.3d at 963. This case presents the opposite scenario. As the EEOC cogently explains, "[N]ot only has no private lawsuit been filed, but the dispute exists *because* the EEOC is attempting to complete its investigation of Morrison's discrimination claims." Appellant's Br. at 33. Third, although pursuant to the Age Discrimination in Employment Act, the statute at issue in *Evans*, the EEOC has determined that a charge alleging a violation of one statute may be amended to allege "that the alleged dis-

---

[7]The reasoning in *Sanchez*, quoted in text, seems especially apt in a case, such as the case before us, in which the basis for the charging party's allegation is the alleged discriminatory impact of a facially neutral literacy policy.

crimination constitutes an unlawful employment practice under another statute administered and enforced by the Commission," 29 C.F.R. § 1626.22(c), it appears § 1626.22(c) was not brought to the court's attention in *Evans*. Thus, *Evans* has no bearing on the appropriate level of deference due to the Commission's promulgation of § 1601.12(b).

For these reasons, we hold that the amended charge of discrimination relates back to the filing date of the original charge and that the EEOC had authority under the ADA to investigate matters relevant to that charge.

### 2.

The Commission also argues that Title VII, not just the ADA, authorized it to investigate, and thus its authority encompassed Morrison's claim that Randstad discriminated against him on the basis of national origin.[8] As explained above, the original charge, which Randstad concedes was timely filed, alleged that Morrison was terminated because he is Jamaican. The amended charge alleged only that the termination was the result of disability discrimination; it omitted the allegation of national origin discrimination and replaced the checkmark for "national origin" discrimination with a checkmark for "disability" discrimination. The EEOC argues this omission is immaterial because the original charge was never "resolved or dismissed" and therefore "continues to

---

[8]Randstad argues the Commission forfeited this argument in the district court, but we disagree. At the hearing on the petition for enforcement, the Commission clearly contended that both asserted bases of authority were valid and independent, and that the ADA relation-back theory was only "one method by which the EEOC would have jurisdiction." J.A. 130; *see also id.* ("[E]ven if we discarded the ADA charge, . . . nothing's been done to supplant or remove the original Title VII charge."); J.A. 136 (explaining that as to Title VII, "he's new to this country, his English is not very good, that's why he can't read and that's why he was run out by Randstad. The other amended charge is ADA because it turns out that he does have a disability.").

serve as a jurisdictional basis for the subpoena." Appellant's Br. at 20. As above, the EEOC's argument turns on the reasonableness of both its regulations and its interpretation thereof.[9]

Under the EEOC's charge-filing regulations, a charge may be resolved in one of five ways: if the EEOC (1) makes a finding of cause; (2) makes a finding of no cause; (3) dismisses the charge; or if (4) the charging party withdraws the charge; or if (5) the parties reach a negotiated settlement. The first three require that the Commission give notice to the parties. *See* 29 C.F.R. § 1601.21 (finding of cause); *id.* § 1601.19 (finding of no cause); *id.* § 1601.18 (dismissal). Similarly, a withdrawal or settlement requires the consent of the Commission. *See id.* § 1601.10 (withdrawal of charge); *id.* § 1601.20 (settlement). The EEOC argues that none of these dispositions occurred; after all, the Commission never gave notice of a finding of cause, no cause, or dismissal, and never gave consent to a withdrawal or settlement. Rather, it argues, under 29 C.F.R. § 1601.12(b) the "additional information" in Morrison's amended charge was "simply incorporated into the original charge," and thus when Morrison amended his charge, Morrison's original allegation of national origin discrimination "remained in place." Appellant's Br. at 22.

Section 1601.12(b), the same regulation the Commission relies upon for its ADA relation-back argument, does not expressly address the scenario here. It provides in pertinent part that "[a] charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein." 29 C.F.R. § 1601.12. The EEOC regulation that governs the withdrawal

---

[9]The district court appears to have assumed without deciding that the amended charge supplemented rather than replaced the original charge. Nevertheless, it rejected the EEOC's effort to enforce the subpoena under Title VII because it concluded the requested materials were irrelevant to the charge of national origin discrimination. We explain *infra* why the relevance determination was erroneous, but explain here why the EEOC did have authority under Title VII.

of charges also does not address whether a charging party who files an amended charge that omits a previously asserted legal theory has "withdrawn" that portion of the original charge. *See* 29 C.F.R. § 1601.10 ("A charge filed by or on behalf of a person claiming to be aggrieved may be withdrawn only by the person claiming to be aggrieved and only with the consent of the Commission.").

We find the phrase "[a] charge may be amended . . . to clarify and amplify allegations made therein," 29 C.F.R. § 1601.12(b), to be ambiguous as applied to the scenario here: it is consistent with, but does not necessarily require, the conclusion that the original charge remained in effect even after the amended charge sought to "clarify and amplify" the original charge. Thus, the dispositive question again becomes whether the EEOC's interpretation of § 1601.12(b) is "plainly erroneous," *Auer*, 519 U.S. at 461. We easily conclude it is not. Morrison's original charge put Randstad on notice that the EEOC might investigate his allegations of national origin discrimination. *See Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) (explaining that "requiring a party to file a charge with the EEOC ensures that the employer is put on notice of the alleged violations . . . [and] places the resolution of employment discrimination disputes initially in the hands of the EEOC") (internal quotation and citation omitted)). Although upon receiving notice of the amended charge Randstad may have assumed the EEOC's investigation would focus instead on the allegation of disability discrimination, any minimal prejudice (which is all but non-existent) Randstad may have perceived does not render the EEOC's interpretation of § 1601.12(b) plainly erroneous. The charge-filing procedure "should not become a tripwire for hapless plaintiffs." *Sydnor*, 681 F.3d at 594.

For these reasons, the original charge triggered the EEOC's investigatory authority under Title VII, and the amended charge (timely-filed because it related back) triggered its authority under the ADA. Accordingly, the EEOC had juris-

diction under both statutes to issue and seek enforcement of the administrative subpoena.

### B.

Once the EEOC has authority to investigate a particular charge of discrimination, it may access "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter *and is relevant to the charge under investigation*." 42 U.S.C. § 2000e-8(a) (emphasis added); *see also* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-8 into the ADA by reference). The "relevant to the charge" requirement contrasts the EEOC's investigatory authority from that of "other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction." *Shell Oil*, 466 U.S. at 64. Tellingly, however, a charge of discrimination "is not the equivalent of a complaint initiating a lawsuit." *Id.* at 68. Rather, it serves "to place the EEOC on notice that someone (either a party claiming to be aggrieved or a Commissioner) believes that an employer has violated the title." *Id.*

Once a charge has placed the Commission on notice that a particular employer is (or may be) violating Title VII or the ADA in a particular way, the Commission may access "virtually any material that might cast light on the allegations against the employer." *Id.* at 68-69. This definition of relevance necessarily is broader than "evidentiary relevance" because in this context "[w]e determine relevancy in terms of the investigation," *EEOC v. Lockheed Martin Corp., Aero & Naval Systems*, 116 F.3d 110, 113 (4th Cir. 1997) (internal quotation marks omitted), not in terms of litigation of the merits of the underlying charge. *See EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d 366, 369 (7th Cir. 2011) (analogizing an EEOC investigation to civil discovery under Fed. R. Civ. P. 26(b)(1), where "[r]elevant," and thereby discoverable, information "need not be admissible at the trial if

the discovery appears reasonably calculated to lead to the discovery of admissible evidence"). Congress has delegated to the EEOC the authority to investigate charges of discrimination, and naturally the agency has developed expertise in that area. In this and other areas, where an agency is tasked with investigation, we "defer to an agency's own appraisal of what is relevant so long as it is not obviously wrong." *Lockheed Martin*, 116 F.3d at 113 (citing *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992)). Accordingly, although "we must be careful" not to render the relevance requirement "a nullity," it "is not especially constraining," *Shell Oil*, 466 U.S. at 68-69, precisely because we largely defer to the EEOC's expertise.

As noted, the requested materials include information on all non-administrative positions made by Randstad's Maryland offices from 2005 to 2009, including position descriptions and copies of applications for each position. The question is whether and to what extent these materials were "relevant" to the EEOC's investigation of Morrison's charges, which alleged that he had approached only the Hagerstown office for assignments, and was terminated in September 2006 as the result of alleged disability and/or national origin discrimination. The district court concluded that none of the requested materials were relevant. The district court's application of an unduly strict standard of relevance amounted to legal error, leading to an abuse of discretion. Applying the correct standard, with deference to the EEOC's assessment of relevance, we conclude that all of the EEOC's requested materials fall within the broad definition of relevance applicable to EEOC administrative subpoenas.

1.

As for Morrison's charge of national origin discrimination, the EEOC argues the requested materials are relevant as follows:

> The information requested in items 3 and 4 will assist the EEOC in determining whether Randstad imposes a literacy requirement that discriminates on the basis of national origin. Knowing the types of non-clerical jobs into which Randstad has placed individuals since January 2005, the year Morrison first sought work through Randstad, will assist the EEOC in ascertaining whether Randstad is correct when it claims that an ability to read is needed to perform all of its laborer positions, or whether Randstad has made other placements—like the Good Humor job Morrison did in September 2005—that can be performed successfully even without an ability to read. This information, in turn, will help the EEOC determine whether Randstad's professed literacy requirement eliminates from consideration individuals who could perform the jobs in question but are nevertheless excluded simply because they cannot read and write English because their national origin is somewhere other than the United States and their native language is not English.

Appellant's Br. at 37-38. This "appraisal of what is relevant . . . . is not obviously wrong," *Lockheed Martin*, 116 F.3d at 113, because the requested information "might cast light on [Morrison's] allegations" of national origin discrimination, *Shell Oil*, 466 U.S. at 69. Accordingly, we defer to the EEOC's assessment of relevance.

The district court rejected the argument that the requested materials were relevant to Morrison's charge of national origin discrimination because it disbelieved one premise of the Commission's relevance argument, namely, that someone from Jamaica might be less proficient in English because he is from Jamaica. That is, the court discerned no factual nexus between Morrison's Jamaican origin and his illiteracy, apparently because although some people in Jamaica speak the language Patois, English is also predominant. *See* J.A. 134

(observing that although in Jamaica "there is what is known as Patois spoken by other members of the community there, sometimes those with lesser education," "English is clearly spoken in Kingston and in Montego Bay").

At the subpoena-enforcement stage, however, "any effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error." *Shell Oil*, 466 U.S. at 72 n.26. The EEOC's authority to investigate "is not negated simply because the party under investigation may have a valid defense to a later suit." *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 651 (7th Cir. 2002). Although there may sometimes be a fine line between, on the one hand, assessing the relevance of requested information to a charging party's allegations and, on the other hand, "determin[ing] whether the charge of discrimination is 'well founded' or 'verifiable,'" *Shell Oil*, 466 U.S. at 72 n.26, we conclude that the district court's rejection of the EEOC's alleged factual nexus crossed the line into an assessment of the merits of Morrison's claim. The effect of inquiring into the merits was essentially to "require[ ] the EEOC to make a reasonable cause showing as a prerequisite to enforcement of the [subpoena]." *Graniteville Co. v. EEOC*, 438 F.2d 32, 36 (4th Cir. 1971). This served "not only to place the cart before the horse, but to substitute a different driver [the district court] for the one appointed by Congress [the EEOC]." *Id.*; *see also EEOC v. Dillon Cos., Inc.*, 310 F.3d 1271, 1277 (10th Cir. 2002) ("We will not . . . either encourage or allow an employer to turn a summary subpoena-enforcement proceeding into a mini-trial by allowing it to interpose defenses that are more properly addressed at trial."). The EEOC has satisfied the relevancy requirement as to the Title VII charge.

2.

The EEOC argues the requested materials are also relevant to the charge of disability discrimination, as it explains:

> Randstad terminated Morrison's employment because the company concluded that absent an ability to read—a condition that, in Morrison, may be the result of an intellectual impairment—Morrison is unable to perform any job for any Randstad's customer. The EEOC already possesses information that undermines Randstad's claim: Morrison was unable to read English when he worked for Randstad in 2005, but he nevertheless successfully completed a monthlong assignment at Good Humor, belying Randstad's claim that English literacy skills are necessary for successful performance of all its laborer positions. The information requested in subpoena items 3 and 4 is relevant to this investigation because it will permit the EEOC to determine whether Randstad's Maryland branches made any other staffing placements into jobs, like the Good Humor assignment, that a person who lacks English literacy skills because of a disability could nevertheless perform.

Appellant's Br. at 39. The district court rejected the EEOC's relevance argument because, in the court's view, the only materials relevant to the EEOC's investigation were those pertaining to the four specific placements to which Morrison was himself assigned; information on other positions were beyond the scope of the EEOC's investigatory authority.[10]

---

[10]Although the district court did not expressly state its reasoning in those terms, we conclude this must have been the district court's implicit premise. The court stated that the requested materials were not relevant to Morrison's disability discrimination charge because "Morrison solely sought employment by Randstad in its Hagerstown office, and was only employed by Randstad from August 2005 until September 2006." *Randstad*, 765 F. Supp. 2d at 742. Although it would seem to follow from that observation that information on position assignments made by the Hagerstown office in 2005-2006 would be relevant to Morrison's charge, the district court nonetheless concluded that *none* of the information the EEOC was seeking was relevant to Morrison's charge. *Id.* Therefore, the district court apparently reasoned that information on position assignments to which Morrison was not assigned was irrelevant to the EEOC's investigation.

The district court's analysis does not square with the deferential standard of relevance the Supreme Court applied in *Shell Oil*.

As discussed above, during an investigation of a charge that a particular employer discriminated in a particular way, the Commission is entitled to access "virtually any material that might cast light on the allegations." *Shell Oil*, 466 U.S. at 68-69. Here, the EEOC has determined that information on positions other than those held by Morrison "might cast light" on his allegations of disability discrimination because it will allow the Commission to "test Randstad's assertion that all of its warehouse and laborer positions require basic literacy skills." Appellant's Br. at 40. If it turns out Randstad's assertion that all of its positions require literacy is unsupported by the requested materials, then those materials might turn out to constitute evidence of unlawful discrimination. Accordingly, information on at least some positions other than those held by Morrison is relevant to the EEOC's investigation.[11]

This raises the somewhat closer question of whether the EEOC overstepped in its assessment of *how many* other non-administrative position assignments were relevant to its investigation of Morrison's charge. Although the EEOC originally requested information for position assignments nationally, it later narrowed its request to Randstad's Maryland offices, for the years 2005 to 2009. Randstad argues in essence that, even if some position assignments beyond those Morrison held are relevant, the geographic and temporal scope of the subpoena goes too far, and we should at minimum limit the subpoena to position assignments made by the Hagerstown office dur-

---

[11]We recognize that in *Shell Oil* the charge at issue was a Commissioner's charge that alleged a pattern or practice of discrimination, *see* 466 U.S. at 67, and thus the scope of the EEOC's investigation arguably may have been broader than the permissible scope of its investigation here. But that factual distinction does not undercut the Court's clear instruction to, in general, defer to the EEOC's assessment of what materials are relevant to its investigation.

ing the years 2005 and 2006, the years during which Morrison was temporarily employed by Randstad. We disagree. Again, we and the district court must defer to the EEOC's appraisal of what is relevant so long as it is not obviously wrong. *Lockheed Martin*, 116 F.3d at 113. We conclude the thirteen-office, five-year scope of the subpoena was not an unreasonable exercise of the EEOC's discretion in deciding how to investigate whether Randstad's literacy policy was discriminatory. Although Randstad is correct that the EEOC must have "a realistic expectation rather than an idle hope that something may be discovered," *United Air Lines*, 287 F.3d at 653, we do not believe, as Randstad argues, that "the EEOC has demonstrated nothing more than 'an idle hope that something may be discovered.'" Appellee's Br. at 33. For these reasons, the requested materials are relevant to the EEOC's investigation.

## C.

The Commission's showing of relevance does not end the inquiry. Even if the requested materials are relevant to a charge of discrimination, Randstad is entitled to attempt to show that compliance with the subpoena would be "unduly burdensome." *Maryland Cup*, 785 F.2d at 477. "The burden of proving that an administrative subpoena is unduly burdensome is not easily met." *Id.* "The party subject to the subpoena must show that producing the documents would seriously disrupt its normal business operations." *Id.* Although "[w]hat is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question," *United Air Lines*, 287 F.3d at 653, an important factor is the cost of production "in the light of the company's normal operating costs." *Maryland Cup*, 785 F.2d at 479.

Here, Randstad's "evidence" of burdensomeness was limited to an affidavit from its Director of IT Applications representing that gathering the information would take three

Randstad employees at least 40 hours each, at a total esti-mated labor cost of $14,000 to $19,000. The district court seemingly relied on this estimate and found that Randstad had established that compliance would impose an undue burden. *Randstad*, 765 F. Supp. 2d at 742. On appeal, the EEOC argues the affidavit is insufficient as a matter of law under *Maryland Cup*. We agree with the EEOC.

The EEOC subpoena in *Maryland Cup* requested, among other things, that the employer provide a list of the race of former employees. 785 F. 2d at 478. Gathering that informa-tion required the company to interview the supervisors and coworkers of former employees, which Maryland Cup asserted would cost $75,000 (in 1985 dollars), a cost that Maryland Cup argued was unduly burdensome. *Id.* at 479. We rejected that argument because the employer had failed to show either that gathering this information was "unduly bur-densome in the light of the company's normal operating costs," or that gathering the information would "threaten" or "seriously disrupt" its "normal business operations." *Id.* at 477, 479. Accordingly, we vacated the district court's denial of the EEOC's petition and instructed the court to enforce the subpoena ("except insofar as it require[d] the company to retrieve evidence from persons no longer under its control"). *Id.* at 479.

We reach a like conclusion here. Randstad's affidavit on burdensomeness asserted only that compiling the requested information would require three employees to spend 40 hours each, at a total cost $14,000 to $19,000. Randstad did not proffer evidence of its "normal operating costs," and the dis-trict court made no such findings. Randstad also did not assert, and the district court did not find, that gathering the requested information would "threaten" or "seriously disrupt" Randstad's business operations. In these circumstances, we conclude that the evidence proffered by Randstad was insuffi-

cient as a matter of law to support a finding that the costs of compliance rise to the level of an undue burden.[12]

## III.

For the foregoing reasons, we reverse and remand for entry of an order granting the EEOC's application for enforcement.

*REVERSED AND REMANDED*

---

[12]As an alternative argument, the EEOC argues the district court committed clear factual error in finding Randstad's cost estimate to be accurate. *See* Appellant's Br. at 42 n.9; *see also supra* p. 10. Because we find Randstad's evidence was insufficient as a matter of law, we need not decide whether there was clear error in this regard.